Michael CHRISTY, Plaintiff,

v.

Dr. Ben ROBINSON, Correctional Medical Services, Defendants.

CIVIL ACTION NO. 01–4062 (JEI).

United States District Court, D. New Jersey.

Aug. 20, 2002.

Michael Christy, Bridgeton, NJ, Plaintiff pro se.

Lally, Holtzman, Gilligan & Quasti, P.C. by Stephen D. Holtzman, Esq., Jeffrey S. McClain, Esq., Linwood, NJ, for Defendants.

## OPINION

IRENAS, District Judge.

Presently before this Court are Defendants Correctional Medical Services' and Dr. Ben Robinson's motion for summary judgment on Plaintiff Michael Christy's 42 U.S.C. § 1983 claim alleging that Defendants were deliberately indifferent to his serious medical needs in violation of his constitutional rights under the Eighth Amendment. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343. For the reasons set forth below, the Court will grant Defendants' motion for summary judgment.

### I.

Plaintiff is a prisoner at the South Woods State Prison in Bridgeton, New Jersey.[1] Up until January 7, 1999, the date of his transfer to South Woods, Plaintiff was housed at Northern State Prison. (Plaintiff's Compl.)

Plaintiff was hospitalized in July 1994 with a rare combination of hepatitis A, B, and C. (Christy Dep. at 11:7–13, attached as Exh. C to Def.'s Cert. in Supp. of Mot. for Sum. Judg. (hereinafter "Christy Dep.").). Plaintiff believes that he contracted hepatitis C in 1985, approximately nine years before he was diagnosed. (*Id.* at 11:23–12:2.) Plaintiff was diagnosed with depression in the mid–1970's, but was never treated; he also believes he may have been diagnosed with a psychiatric disorder in 1982. (*Id.* at 29:19–23; 30:1–12.) Plaintiff testified at his deposition that he had used drugs in the past and had, on occasion, experienced drug induced hallucinations. (*Id.* at 30:23–24.)

Plaintiff brings this claim under 42 U.S.C. § 1983 claiming that Defendants violated his Eighth Amendment rights by ignoring the opinions of specialists, refusing treatment of his hepatitis C and related arthritis and failing to correct a past misdiagnosis and treat him with the proper medication.[2] (Compl. at 4.)

In April 1998, while at Northern State, Dr. Trevor Parks advised the Plaintiff that he suffered from rheumatoid arthritis ("RA"). (Christy Dep. at 23:11–24.) Later in July, Dr. Sherree Starrett[3] wrote a consultation request for Plaintiff to see a rheumatologist based on the new diagnosis of RA. (Christy Dep. at 38:18–39:12); (CMS Christy 75–76, attached as Exh. B to Def. Mot. for Sum. Judg.(hereinafter "Exh. B").) Dr. Starrett noted that tests revealed Plaintiff had a positive RH factor[4] and suggested disease modifying medications, Lodine[5] and orthotics to alleviate

---

1. Plaintiff had advised the Court of the possibility he would be released to a drug treatment program. Def.s' Stmt. of Undisp. Mat. Facts in Supp. of Mot. for Sum. Judg., at 2. However, the Plaintiff recently advised the Court that he would not be transferred.

2. Plaintiff's claims are in regards to the diagnosis and treatment of his hepatitis C and arthritis. On January 22, 2002, the Honorable Robert B. Kugler denied Plaintiff's application to include claims regarding his chronic sinusitis condition. *Christy v. Robinson,* No. 01–4062, (D.N.J. Jan. 22, 2002) (order denying Plaintiff leave to amend complaint to include sinus condition).

3. Dr. Starrett is listed on the consultation request as one of the facility physicians for Northern State.

4. A positive RH factor can be a signal of RA.

5. Lodine is a non-steroidal anti-inflammatory drug ("NSAID") used for acute and long term use in relieving the symptoms of osteoarthritis and RA. *The Physician's Desk Reference,* 56th Edition, 2002, p. 3538.

Plaintiff's symptoms. *Id.* Dr. William Ryan[6] saw Plaintiff and issued a report on August 21, 1998 which noted Plaintiff's medical history, including hepatitis A, B, and C. Dr. Ryan observed that Plaintiff suffered from RA in multiple joints, and made suggestions for prescription pain relief and treatment. (Exh. B at CMS Christy 77–79; Christy Dep. at 39:10–25.) Plaintiff received prescriptions for Lodine in October of 1998 and January of 1999. (Exh. B at CMS Christy 81–84; 88–89.)

In January 1999, Plaintiff was transferred to South Woods State Prison. Pursuant to a contract with the New Jersey Department of Corrections, Defendant CMS provides medical services to inmates at South Woods through its independent contractors. (Gambrell Cert. at ¶ 5.) From the time of Plaintiff's transfer to South Woods until August 3, 2001, Defendant Dr. Ben Robinson was the director of medical services at South Woods. (Robinson Cert. at ¶ 3.) Dr. Robinson evaluated and treated the patient on numerous occasions. (*Id.*) As Plaintiff had been diagnosed with RA before his arrival at South Woods, Dr. Robinson continued with a course of treatment for RA, including evaluations, medications, consultations, and offers of physical therapy.

Dr. Suresh Kulkarni wrote a consultation request for Plaintiff in April 1999, and noted the RA and a positive RH factor. (Exh. B at CMS Christy 98.) In response to this request, Plaintiff was seen by Dr. Ryan on May 14, 1999. *Id.* Again, there

was a diagnosis of RA and prescriptions given for Lodine and Methotrexate.[7]

In January 2000, a consultation request to rheumatology was written for Plaintiff by Nurse Practitioner Brian Kidd ("NP Kidd") and Plaintiff was sent to see Dr. N. Tika, a rheumatologist at Robert Wood Johnson University Hospital in New Brunswick, New Jersey. Dr. Tika was the first doctor to diagnose Plaintiff with hepatitis C-related arthritis. While Dr. Tika did not comment one way or the other as to Plaintiff's eligibility for interferon/ ribavirin therapy, he did advise Plaintiff that treatment for his hepatitis C would relieve the symptoms of hepatitis C-related arthritis. (Christy Dep. at 28:15–22.) Dr. Tika provided Plaintiff with Naprosyn and recommended that Plaintiff follow up with X-rays and blood work, including liver function tests. (Exh. B at CMS Christy 134–35; Christy Dep. at 28:2–4.) In September 2000, Dr. Tika again noted a diagnosis of RA and hepatitis C-related arthritis. He also prescribed an increase in Plaintiff's Celebrex[8] dosage to 200 mg/ twice a day. (Exh. B at CMS Christy 163.)

Given the previous diagnosis of RA, Dr. Robinson continued on a course of treatment for RA. He did not interpret Dr. Tika's report to order or recommend a different course of treatment. (Robinson Cert. at ¶¶ 6–7.) Dr. Robinson did switch Plaintiff from Lodine to Celebrex.[9] (Christy Dep. at 57:1–10.) The Celebrex did not initially alleviate Plaintiff's pain and discomfort, but he testified that he felt

6. Dr. Ryan was originally named as a defendant in this litigation, but was dismissed from the action by this Court. *Christy v. Robinson,* No. 01–4062 (D.N.J. Oct. 26, 2001) (order dismissing claims in their entirety against Dr. Ryan for failure to state a claim upon which relief may be granted).

7. Methotrexate is indicated for relief of severe pain. *The Physician's Desk Reference,* 56th Edition, 2002, p. 3056.

8. Celebrex is a non-steroidal anti-inflammatory drug used for relief of the signs of osteoarthritis and RA. *The Physician's Desk Reference,* 56th Edition, 2002, p. 2676–77.

9. According to Plaintiff's testimony, 400 mg/ day is the maximum allowable dosage. (Compl. at 6.)

better after thirty days. (Christy Dep. at 58:7–12.) Dr. Robinson found Dr. Tika's orders to be consistent with Plaintiff's previous diagnosis of RA and Plaintiff's course of treatment at that time. (Robinson Cert. at ¶¶ 6–7.)

The record indicates that Plaintiff signed for sixty tabs of Celebrex, 200 mg each on May 14, June 14, and July 14. (Exh B at CMS Christy 197, 200, 210.) Defendants also contend that Plaintiff may have at most gone a few days without Celebrex, because he had his sixty tablets from July 14.

In July 2001, a consultation request was written and Plaintiff was seen by Dr. Gordon.[10] Dr. Gordon opined that Plaintiff suffered from either RA or chronic hepatitis C arthralgia/ arthritis. (Christy Dep. at 61:17–62:1; Plaintiff's Br. Sum. Judg. at Exh. 1.) Plaintiff was led to believe Dr. Gordon ordered a regimen of blood work and informed the medical staff at the prison that he was suffering from a hepatitis C-related condition.[11] (Christy Dep. at 61:5; Compl. at 6.) Dr. Gordon's report did not advise any significant changes in Plaintiff's course of treatment.

After his consultation with Dr. Gordon, Plaintiff returned to the prison medical station and informed Nurse Practitioner Fran Green ("NP Fran Green") that he was diagnosed with hepatitis C-related arthritis. Plaintiff contends that NP Green then denied him his medication. (Christy Dep. at 85; Pl.'s St. of Facts at 14.) Defendants do not deny that Plaintiff's prescription for Celebrex was put on hold and subsequently reordered on August 9 and reinstated on August 22. During the peri-od that Plaintiff's medication was suspended, he suffered severe swelling and intense pain in his hands, feet and knees, and also suffered anxiety attacks with depression and was placed in one to one and group counseling. (Pl.'s Opp. Br. at 1, 5–6.) Plaintiff notes that "out of sympathy," on August 18th and 19th Nurse Dawn Green and Nurse Alex provided him with some Celebrex and ice. (Christy Dep. at 85.)

Plaintiff contends that NP Green stopped treatment with Celebrex because Plaintiff continuously inquired about his status and questioned the accuracy of his diagnosis. (Pl. Opp. Br. at 5–6.) Plaintiff also argues that NP Green and Dr. Robinson, after treating the Plaintiff for such a long period of time, knew or should have known that any discontinuation of his medication would result in severe pain and suffering.

Defendants do not deny that Plaintiff's prescription was put on hold. However, NP Fran Green contends that she placed the prescription on "hold" after hearing from Plaintiff that Dr. Gordon found he did not have RA because she thought it best to review Dr. Gordon's report to ensure that Celebrex was still appropriate. After reviewing Dr. Gordon's report on August 9, NP Fran Green put in a re-order. NP Fran Green found that Dr. Gordon's report did not prescribe any significant changes in Plaintiff's course of treatment and indicated that Celebrex would remain as Plaintiff's primary arthritis medicine. Plaintiff's prescription for Celebrex was briefly delayed pending approval by NP Fran Green's supervisor, Dr. Abu Ashan.[12] (Def. Reply Br. at 6.)

**10.** Dr. Gordon is a consultant with Rheumatology Associates.

**11.** Dr. Gordon later noted some test results: a positive RH factor, with no titer; negative ANA at 1.40; ESR equal to 24, which is borderline significance. (Addendum to Dr. Gordon's report, attached as Exh. 1(A) to Pl.'s Br. in Opp. to Sum. Judg.)

**12.** Dr. Abu Ashan was serving at that time as the statewide medical director of CMS and the regional director for the southern region, which includes South Woods.

Dr. Ben Robinson and the staff at South Woods had noted that Plaintiff tested positive for hepatitis C. The status of Plaintiff's hepatitis C was monitored through various laboratory tests. (Robinson Cert. at ¶ 8.) Dr. Ben Robinson had not changed his opinion that Plaintiff's RA and not his hepatitis C was the cause of Plaintiff's arthritis. Plaintiff requested specific treatment, interferon/ribavirin, which is a relatively new drug treatment for hepatitis C. However, Dr. Robinson determined, based on the results of several normal liver function tests, that Plaintiff's hepatitis C was not at a point where it needed to be treated with intensive drug therapy and, therefore, Plaintiff's request was denied. (*Id.* at ¶ 9.)

The U.S. Department of Justice, Federal Bureau of Prisons issued a Technical Reference Manual titled "Infectious Disease Management," dated January 26, 1999, which governs the evaluation and treatment of prisoners with hepatitis C. (Attached as Exh. F to Def. Mot. for Sum. Judg.) While prescriptions for interferon alone or in combination therapy with ribavirin are acceptable treatments for hepatitis C, there is an algorithm for treatment and a listing of regulations a doctor must consider before prescribing interferon or interferon/ribavirin therapy. *Id.* Dr. Robinson and his staff found that Plaintiff was not a suitable candidate for the treatment because his hepatitis C had not progressed far enough along to justify such an intensive program of drug therapy. Also, since Plaintiff had normal liver function test results and because he failed to meet certain criteria listed in the regulations, due to the fact he had a history of depression and psychiatric illness and could possibly be

released in the next twelve months, it was determined that Plaintiff was not eligible for interferon/ribavirin therapy.[13] (Robinson Cert. at ¶ 9; Def. Mot. for Sum. Judg.) Based on Plaintiff's test results and Bureau of Prisons regulations, Dr. Robinson and his staff determined that drug intensive treatment was not appropriate and instead proceeded with a course of action that included close monitoring of Plaintiff's hepatitis C.

On October 26, 2001 in response to Dr. Robinson's and CMS' alleged denial of treatment for his hepatitis C and alleged misdiagnosis and mistreatment of hepatitis C-related arthritis, Plaintiff filed a complaint in the District Court of New Jersey alleging under 42 U.S.C. § 1983 that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. On November 20, 2001, this Court ordered that CMS arrange for Plaintiff to be examined by two independent doctors, and that those doctors address the following questions: "(1) Does Plaintiff have RA, and if so, what is the appropriate treatment?; and (2) is Plaintiff's hepatitis C advanced to a stage where treatment with interferon, et. al., is appropriate?" *See Christy v. Robinson*, No. 01–4062, November 20, 2001 (order directing CMS to provide two independent evaluations of Plaintiff).

Dr. Falasca, a rheumatologist at Cooper Medical Center, met with the Plaintiff on December 20, 2001. He initially diagnosed Plaintiff with osteoarthritis, but was unsure if Plaintiff also suffered from RA or hepatitis C-related arthritis. (Exh. D to Def.'s Mot. for Sum. Judg. (hereinafter Exh. D); Christy Dep. at 21:13–22:3;

---

**13.** "Treatment with interferon almost always has serious side effects, such as an initial influenza like reaction with chronic symptoms, such as fatigue, myalgia, headaches, irritability, rage, confusion, and neuropsy-

chiatric disorders. Depression and thyroid problems also may develop, even when there was no prior history." (Exh. F to Def. Mot. for Sum. Judg. at TRM 6100.02 § c3(1).)

67:23–68:15.) In a supplement to his handwritten report dated December 20, 2001, Dr. Falasca wrote a letter dated December 31, 2001 in which he further elaborated on Plaintiff's case. (Exh. E to Def.'s Mot. for Sum. Judg. (hereinafter Exh. E).) He first noted the uncertainty in the medical field regarding the proper methods for diagnosing and treating hepatitis C. He then expanded on his diagnosis of osteo-arthritis and stated that the nodules which Plaintiff complained about constantly and which were said to be RA nodules by CMS medical staff are in fact osteo-arthritic bone spurs. (Exh. E.) Dr. Falasca opined in his December 31st letter that "based on clinical criteria alone, Mr. Christy would easily meet the 1990 American College of Rheumatology criteria for rheumatoid arthritis." *Id.* However, Dr. Falasca remained uncertain whether Plaintiff suffered from RA, or if he suffered from hepatitis C-related arthritis. Dr. Falasca explained how the medical evidence could support a diagnosis of RA or a diagnosis of hepatitis C-related arthritis, and concluded with a list of tests which would be helpful in making a more definitive diagnosis. *Id.* Dr. Falasca also indicated his preference for traditional courses of treatment, which would not include interferon/ribavirin therapy. *Id.*

In a follow-up letter dated May 13, 2002, addressed to Mr. Holtzman, Dr. Falasca clarified his position and stated that "there was no doubt in [his] mind at this time that [Plaintiff] has naturally occurring rheumatoid arthritis." (Exh. H to Def.'s Mot. for Sum. Judg. (hereinafter Exh. H).) Dr. Falasca further opined that even if Plaintiff's arthritis was related to his hepatitis C, the treatment that Plaintiff requests, interferon and/or ribavirin, would not be the preferred treatment. *Id.* Dr. Falasca commented that while the hepatitis C may limit some treatment options for Plaintiff's RA, the hepatitis C is only a "coincidental infection." Dr. Falasca concluded that Plaintiff's current course of treatment is appropriate and that Defendants had not deviated from standard practice. *Id.*

Dr. Joseph John, a physician at Robert Wood Johnson Medical School/ UMDNJ, Division of Allergy Immunology and Infectious Diseases, was the second expert retained. He reviewed Plaintiff's medical files and provided a report via e-mail on January 23, 2002 and a subsequent report, via mail on May 22, 2002.[14] (Exh. G & I to Def. Mot. for Sum. Judg.) Dr. John stated that a liver biopsy could show the extent of inflamation, if any at all, which could assist in determining what type of therapy, if any, would be appropriate. However, Dr. John concluded that a liver biopsy is "optional and not mandatory" and "assume[d Plaintiff had] no signs of chronic liver disease." (Exh. G.) Dr. John found Plaintiff would not need any therapy, because Plaintiff had the disease for so long and there was a "lack of hepatic enzyemia at this time (normal OT, PT)." *Id.* In his later report, Dr. John cited more specific medical evidence to support his conclusions, noting, for example, that Plaintiff showed no signs of liver enlargement or disease and Plaintiff's test results showed normal liver enzymes. (Exh. I.) Dr. John concluded that Plaintiff has received adequate treatment to date, and, indeed, opined that any other treatment, such as interferon/ribavirin, for the hepatitis C infection could very well have worsened his health. *Id.*

## II.

■ Before addressing the merits of Defendant's motion for summary judg-

---

**14.** Plaintiff has objected to Dr. John's reports because he has never met with Plaintiff and Plaintiff is unaware of any blood work which Dr. John could have used in formulating his opinion. (Pl.'s Emer. Update and Req. for Invest.)

ment, this Court will *sua sponte* revisit Plaintiff's request for appointment of counsel. The analysis will pay particular attention to the Third Circuit's recent decision in *Montgomery v. Pinchak*, 294 F.3d 492 (3d Cir.2002). In *Montgomery*, the Third Circuit was presented with a prisoner, who proceeded *pro se*, claiming under § 1983 that his constitutional rights were violated when he was denied adequate medical care. Montgomery had submitted an application with the district court for the appointment of counsel. Although he had experienced some difficulty in obtaining discovery, Montgomery was literate and had demonstrated some understanding of the discovery rules. The district court denied Montgomery's request for appointment of counsel and granted summary judgment in favor of the defendants. However, on appeal, the Third Circuit found that the district court had abused its discretion and that counsel should have been appointed. Furthermore, because the Court concluded that Montgomery was prejudiced by his lack of counsel when responding to the motion for summary judgment, the district court's grant of summary judgment was vacated and the case remanded for further proceedings. In light of the similarities between *Montgomery* and the case at bar, this Court

believes it appropriate at this time to reconsider Plaintiff's application for the appointment of counsel and to provide a thorough examination of the factors guiding the decision to appoint counsel in civil cases.[15]

 It is well established that there is no statutory or constitutional right of counsel conferred upon indigent civil litigants. *See Parham v. Johnson*, 126 F.3d 454, 456–57 (3d Cir.1997). However, district courts have the discretion to appoint counsel under 28 U.S.C. § 1915(d), which provides that a court may request[16] an attorney to represent any such person unable to afford counsel and may dismiss the case if the allegation of poverty is untrue, or if satisfied that the action is frivolous or malicious. 28 U.S.C. § 1915(d); *Montgomery*, at 498. District courts may utilize this power to appoint counsel at the request of the plaintiff or may do so *sua sponte* if the court finds appointment appropriate as the case moves forward.[17]

Generally, the Third Circuit has interpreted § 1915 to grant district courts broad discretionary power in determining whether counsel should or should not be appointed. *Tabron v. Grace*, 6 F.3d 147, 153–55 (3d Cir.1993)(holding that neither the language of the statute nor its legisla-

---

**15.** A district court's exercise of its power to appoint counsel in civil cases is reviewable under the abuse of discretion standard. *Tabron v. Grace*, 6 F.3d 147, 158 (3d Cir.1993). It is "desirable for the district court to explain the reasons for its decision" in order to assist the appellate court in its determination of whether "the district court made a reasoned and informed judgment regarding appointment of counsel." *Id.*

**16.** The district courts have the power to "request" counsel for a civil litigant, but they lack to the power to "require" an unwilling attorney to serve as counsel. *See Mallard v. United States Dist. Court for Southern Dist. of Iowa*, 490 U.S. 296, 301–02, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989)

**17.** "[W]e emphasize that appointment of counsel under section 1915(d) may be made at any point in the litigation and may be made by the district court *sua sponte*." Accordingly, even if it does not appear until trial (or immediately before trial) that an indigent litigant is not capable of trying his or her case, the district court should consider appointment of counsel at that point. *Tabron*, 6 F.3d 147, 156–57 (citations omitted). In light of the Third Circuit's vacation of summary judgment in *Montgomery*, this Court believes it appropriate to reconsider Plaintiff's request for appointment of counsel at this stage in the litigation.

tive history "suggests that appointment is permissible only in some limited set of circumstances"). Presently, the circuits are split as to the degree of discretion to be afforded to the district courts in granting requests for appointment of counsel. *Compare Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986) (recognizing some circuits have adopted a more "stringent" approach, but opting to follow the lead of the Seventh Circuit) *andMaclin v. Freake,* 650 F.2d 885 (7th Cir.1981) (providing a list of factors for consideration and allowing district courts broad discretion in deciding to grant a request for appointment of counsel) *with Lavado v. Keohane,* 992 F.2d 601, 605–06 (6th Cir.1993) (holding that district courts in the Sixth Circuit may appoint counsel to represent indigent civil litigants only when "exceptional circumstances" are present) *and Cookish v. Cunningham,* 787 F.2d 1, 2 (1st Cir.1986) ("[A]n indigent litigant must demonstrate exceptional circumstances in his or her case to justify the appointment of counsel.") *and Aldabe v. Aldabe,* 616 F.2d 1089, 1093 (9th Cir.1980) ("[T]his court has limited the exercise of [discretionary power under § 1915] to exceptional circumstances.").

▬ According to the Third Circuit, in order for a court to exercise its broad discretion and appoint counsel, the plaintiff first must demonstrate that his or her case has "some merit in fact and law." *Montgomery,* 294 F.3d at 499 (citing *Parham v. Johnson,* 126 F.3d 454, 456–57 (3d Cir. 1997)); *Tabron,* 6 F.3d at 155. At the summary judgment stage, a plaintiff satisfies this threshold "where the conduct alleged ... clearly state[s] a non-frivolous, *prima facie* case of deliberate indifference to a serious medical need" and "the al-ready established evidence indicates more than and 'extremely slim' chance of success on the merits." [18] *Montgomery,* at 499–500. Once the plaintiff has met the above threshold standard, the district court is directed to carefully consider plaintiff's request for counsel utilizing a list of factors provided by the Third Circuit. *Montgomery,* at 499; *Tabron,* 6 F.3d at 155. These "post-threshold" factors include: (1)the plaintiff's ability to present his or her own case; (2) the difficulty of the particular legal issues; (3) the degree to which factual investigation will be necessary and the ability of the plaintiff to pursue such investigation; (4) the plaintiff's capacity to retain counsel on his or her own behalf; (5) the extent to which a case is likely to turn on credibility determinations, and; (6) whether the case will require testimony from expert witnesses. *Montgomery,* at 499 (citing *Tabron,* 6 F.3d at 155–57).

Plaintiff's original application for appointment of counsel was denied in a detailed opinion by the Honorable Robert B. Kugler, U.S. Magistrate Judge. *Christy v. Robinson,* et al., No. 01–4062 (D.N.J., filed Jan. 22, 2002) (order denying motion for appointment of counsel). In evaluating Plaintiff's request, Judge Kugler relied on § 1915 and the Third Circuit's decision in *Tabron,* and determined that Plaintiff was not entitled to appointed counsel. *Id.* at 8, 11. Judge Kugler found that while Plaintiff's claims were important, they were not "overly complex," and the factual investigation and discovery process were likely not going to be any more complicated than the usual case. *Id.* at 10. In addition, in finding that Plaintiff should proceed without appointed counsel, Judge Kugler noted Plaintiff's education and training as a cer-

---

**18.** Policy considerations discourage appointment of counsel in frivolous or unmeritorious cases because a lawyer's time is so valuable and the demand for appointed attorneys far exceeds the supply. *See e.g., Montgomery,* at 499; *Parham,* 126 F.3d at 458. *See also infra* notes 20–21 and accompanying discussion.

tified legal assistant/ paralegal at South Woods State Prison, and access to and familiarity with the prison library. *Id.*

Before applying the six factors described in *Montgomery,* a district court must first determine whether Plaintiff's claims have "some merit in fact and law." *Montgomery,* at 499–500; *Parham,* 126 F.3d at 457–58. In order to justify the appointment of counsel, an indigent plaintiff must, at a minimum, allege the necessary components of an Eighth Amendment claim of inadequate medical treatment[19] and the claim may not be frivolous, malicious or based merely on bald assertions. *Montgomery,* at 499–500. The district court must further assess the likelihood that Plaintiff can succeed on his claims. *See e.g., Montgomery,* at 499–500. Since the demand for appointed counsel in civil cases far exceeds the supply of attorneys willing to take on such work at their own expense, courts, as a general policy,[20] will not appoint counsel in cases where the plaintiff is unlikely to succeed. *Hodge v. Police Officers,* 802 F.2d 58, 60 (2d Cir. 1986) (noting potential demand "could be overwhelming" if cases which "technically put a fact in issue . . . required appointment of an attorney"); *Maclin,* 650 F.2d 885, 887 (7th Cir.1981) (If the courts did not wisely apply discretion, "the appointment in most instances would work a hard-

ship on counsel with no concomitant benefit to the party requesting it.") (citations omitted).[21]

■ In the case at bar, Plaintiff has articulated his allegations in such a way as to "conform[ ] to the language of caselaw," by claiming he suffers a "serious medical need" and that defendants were "deliberately indifferent" to his need for medical care. *See Montgomery,* at 499–500. However, while Plaintiff has put forth a colorable Eighth Amendment claim, this Court finds his chances for success are too low to warrant the appointment of counsel. *See e.g., Hodge,* 802 F.2d at 60; *Maclin,* 650 F.2d at 887 ("counsel is often unwarranted where the indigent's chances of success are extremely slim."); *Miller v. Pleasure,* 296 F.2d 283, 285 (2d Cir.1961) (holding there was no abuse of discretion on the part of the district court, because "[t]he chances of any measure of success for the plaintiff's claims are so highly dubious that a judge cannot properly ask a member of the bar to assume this thankless burden.").

The case at bar is distinguishable from the facts described in *Montgomery,* where the Third Circuit found that Montgomery had alleged more than medical malpractice and had stated claims that appeared to rise to the requisite level of indifference. *Montgomery,* at 500–01. In this case,

---

**19.** The Supreme Court set forth a standard to be applied in all prisoner claims of inadequate medical treatment which requires a plaintiff show that the defendants acted "with deliberate indifference to his or her serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). *See infra* at pp. 412–16 for the analysis of Plaintiff's claim under the *Estelle* standard.

**20.** While district courts have broad discretion to appoint counsel, there are "significant practical restraints" on this discretion, including "the ever-growing number of prisoner civil rights actions filed each year in the federal courts; the lack of funding to pay ap-

pointed counsel; and the limited supply of competent lawyers who are willing to undertake such representation without compensation." *Tabron,* 6 F.3d at 157.

**21.** The Third Circuit in *Montgomery* noted these practical restraints but still found that counsel should have been appointed to Montgomery at the district court level. *Montgomery,* at 505, FN 10 (While noting limitations and practical restraints, the Third Circuit still found that "prudent observance of the *Tabron* factors should allow for the appropriate allocation of limited legal resources to those genuinely meritorious indigent civil cases that require and deserve *pro bono* legal counsel.").

Plaintiff makes allegations that he was mis-diagnosed, denied a particular form of medical treatment, and that his medication was temporarily suspended. Given the nature of Plaintiff's claims and the evidence in the record, it is doubtful that Plaintiff will be able to show that defendants, Dr. Robinson and CMS, acted in such a way that would rise to the level of deliberate indifference required to establish a violation of the Eighth Amendment. *See Isenberg v. Prasse*, 433 F.2d 449 (3d Cir.1970) (per curiam) (differences in opinions between patients and doctors do not amount to an Eighth Amendment violation). While the evidence presented by Plaintiff may support a claim for medical malpractice, it is unlikely even with the benefit of counsel that Plaintiff could demonstrate the type of "deliberate indifference" necessary to establish a constitutional violation. *See Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir.1993) (A prisoner "must show more than mere negligence; he must show deliberate indifference to a serious medical need.") (citing *Estelle*, 429 U.S. at 104–06, 97 S.Ct. 285).

Moreover, even were this Court were to find that Plaintiff's claims do satisfy the threshold requirement, the six factors articulated by the Third Circuit would not weigh in favor of appointing counsel in this case. The six factors are not held out to be exhaustive, and no factor alone is determinative. *Parham*, 126 F.3d at 458; *Tabron*, 6 F.3d at 157. This Court will examine all six factors in turn.

When considering the first factor— a plaintiff's ability to present one's own case—a court should review the plaintiff's education, literacy, prior work experience and prior litigation experience.[22] *See Tabron*, 6 F.3d at 156. In addition, a court may weigh any restraints placed upon a plaintiff by virtue of the fact that he or she is a prisoner. *Montgomery*, at 501; *Tabron*, 6 F.3d at 156. The Third Circuit has found that a plaintiff's ability to file and respond to opposing counsel does not "alone ... conclusively establish that [a plaintiff is] able to present his own case." *Montgomery*, at 501 (quoting *Parham*, 126 F.3d at 459).

In *Montgomery*, the Third Circuit noted in support of appointing counsel that Montgomery had no prior litigation experience, was not a "jailhouse" lawyer, and was "hindered" by technical problems stemming from the "intricacies of the discovery rules." *Montgomery*, at 502. Unlike Montgomery, Plaintiff has received legal training while in prison. Indeed, he has earned a paralegal/ legal assistant certificate and now serves as a prison law library clerk/ paralegal, assisting other prisoners in filing similar suits. The Court is mindful that the rules of discovery can be complex and that there are limits on Plaintiff's resources because he is incarcerated; however, Plaintiff, unlike Montgomery, has not experienced any significant difficulty obtaining the documents necessary to support his allegations. In addition, Plaintiff has demonstrated throughout this litigation that he is capable of competently interacting with opposing counsel and the Court.

The Third Circuit further directs district courts to consider the complexities and intricacies of the legal issues involved, because when the "law is not clear, it will often best serve the ends of justice to have both sides of a difficult legal issue presented by those trained in legal analysis." *Tabron*, 6 F.3d at 156 (quoting *Maclin*, 650

---

**22.** The Third Circuit has observed that a plaintiff's ability to present his or her own case is to be accorded significant weight. *Montgomery,* at 501 (characterizing this factor as "[p]erhaps the most significant"); *Tabron,* 6 F.3d at 156 (describing this component of the post-threshold analysis as "a significant factor.").

F.2d at 889). In *Montgomery*, the Third Circuit noted that there may be situations where cases involving claims of deliberate indifference under the Eighth Amendment will "raise sufficiently complex legal issues to require appointment of counsel." *See Montgomery*, at 502–03 (citing *Parham*, 126 F.3d at 459).

In denying Plaintiff's request for appointment of counsel, Magistrate Kugler found that the law on the particular issues involved in Plaintiff's case to be fairly straightforward and concluded that Plaintiff should be able to handle this area of the law without the assistance of counsel. *See Christy v. Robinson*, et al., No. 01–4062 (D.N.J., filed Jan. 22, 2002) (order denying motion for appointment of counsel). Plaintiff's demonstrated ability to present his claims and the evidence supporting them within the appropriate legal framework confirms Magistrate Kugler's original determination that the legal issues are not overly complex.

A court must also consider the degree to which factual investigation will be necessary and Plaintiff's ability to pursue such investigation. The Third Circuit noted in *Montgomery* that while counsel need not be appointed for every potentially successful plaintiff, because in Montgomery's case the crux of his allegations revolved around missing medical records, there was strong support for appointment of counsel due to the necessity of factual investigation and the difficulty he as a prisoner would face in undertaking such investigation. *Montgomery*, at 503. The Third Circuit suggested that without those "key records" and given Montgomery's inability to depose defendants while in prison, Montgomery would be unable to build his case. *Id.* at 503–04.

In the instant case, as in *Montgomery*, there is also a need for factual investigation. However, Plaintiff's medical files are readily available and the record is fairly clear and straightforward. Plaintiff's situation is distinguishable from that faced by Montgomery. Whereas Montgomery was faced with the daunting task of undertaking extensive factual investigation in order to recreate his medical records and establish the proof necessary to support his case, in the case at bar, Defendants have produced the bulk of Plaintiff's medical file and there is no indication that any files are being withheld.

If a plaintiff is able to retain and pay counsel on his own, then the district courts may not appoint counsel. This factor is not contested in the case at bar. There is no evidence in the record which would suggest Plaintiff could retain or pay counsel on his own. Accordingly, this factor will be viewed in support of the appointment of counsel.

In determining whether appointment of counsel is appropriate, the Third Circuit instructs district courts to determine whether or not the case will turn on credibility determinations. *Montgomery*, at 505;[23] *Parham*, 126 F.3d at 460 ("whether the case [will be] solely a swearing contest"). Credibility determinations may play some role in the case at hand, as they would in any case brought to trial. However, as many of the underlying facts are undisputed, disposition of Plaintiff's claim is not likely to turn on credibility determinations.

Finally, the Third Circuit directs district courts to examine the potential need for expert witnesses. *Montgomery*, at 503–04. The greater the necessity for an expert, especially in the medical field, the greater

---

**23.** In *Montgomery*, the Third Circuit found this factor to be the only one which did not support the appointment of counsel. *Montgomery*, at 505.

the necessity for appointed counsel. *Montgomery,* at 503–04; *Parham,* 126 F.3d at 460. In *Montgomery,* the Third Circuit found a medical expert would be necessary and noted that "it was clear" Montgomery would not be able to describe the medical consequences of inadequate treatment, especially the effects of his HIV and heart condition as they generally do not "clearly manifest themselves in ways that are obvious and ascertainable to a lay person." *Montgomery,* at 504.

Plaintiff in the instant case would likely need an expert to present medical testimony regarding any diseases he has contracted and the potential harm related to any misdiagnosis, if any. While there may be visible damage from the arthritis, the bulk of Plaintiff's claim will likely deal with his pain, the damage, if any, to his liver, and the possibility of disability in the future. In response to such concerns, this Court ordered that Plaintiff be seen by two independent doctors, who later submitted reports to the court. *See Christy v. Robinson,* et al., No. 01–4062 (D.N.J., filed Nov. 20, 2001) (order directing that Plaintiff be seen by two independent doctors, an infectious disease expert and by a rheumatologist). Accordingly, while there would be a need for medical testimony if this case were to go to trial, this Court has already addressed this issue by ordering two independent evaluations from experts in the field.

This Court finds nothing in the record to indicate that Plaintiff has at any time been unable to proceed *pro se* or that his due process rights would be impinged by the lack of counsel. *See Maclin,* 650 F.2d at 886 ("denial of counsel will not be overturned unless it would result in fundamental unfairness impinging on due process rights") (citations omitted). Plaintiff has

not met the threshold standard and furthermore, denial of Plaintiff's application for appointed counsel is consistent with the ruling in *Montgomery* and the six factor evaluation. Accordingly, because Plaintiff's claims are unlikely to be meritorious and because only one of the six factors identified by the Third Circuit in *Montgomery* weighs in favor of the appointment of counsel, the Court reaffirms its decision to deny Plaintiff's request for the appointment of counsel.

## III.

"[S]ummary Judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 56(c)). In reviewing a motion for summary judgment, the role of this Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 242–43, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). However, the non-moving party "may not rest upon the mere allegations or denials of his pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (citations omitted).[24]

---

24. Due to the fact plaintiff is proceeding *pro se,* this Court will construe his pleadings liberally. *Clark v. Doe,* No. Civ. A. 99–5616,

2000 WL 1522855, at *1 (E.D.Pa. Oct. 13, 2000) (citing *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)).

## IV.

Defendants contend summary judgment should be granted because there are no genuine issues of material fact and the evidence in the record is insufficient to establish that the medical treatment provided constituted deliberate indifference to Plaintiff's serious medical needs. Furthermore, Defendants contend they cannot be held vicariously liable for the actions of other doctors and medical staff and that Plaintiff may not receive punitive damages because there was no willful, intentional, reckless or callous indifference in violation of Plaintiff's civil rights. For the reasons set forth below, Defendants' motion for summary judgment will be granted.

 Plaintiff's claim is based in 42 U.S.C.1983,[25] which is not in and of itself a source of substantive rights, but instead "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (citations omitted). In order to assert a § 1983 claim, a plaintiff must allege that his rights under the Constitution or laws of the United States were violated, and further that the purported violation "was committed by a person acting under color of State law." *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Shaw v. Strackhouse*, 920 F.2d 1135, 1141–42 (3d Cir.1990).

 Because there is no dispute that Defendants are considered to be state actors for purposes of 42 U.S.C.1983,[26] the issue is whether there are material issues of disputed fact in the summary judgment record with respect to whether Defendants violated Plaintiff's constitutional rights. The Supreme Court has established that incarcerated prisoners, under the Constitution, are entitled to reasonable medical care and may hold prison officials liable under the Eighth Amendment if medical care is inadequate or altogether denied. *Estelle v. Gamble*, 429 U.S. 97, 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Finding that prisoners were dependant upon the government for care and that the government had an obligation to provide medical care to prisoners, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* at 104, 97 S.Ct. 285 (citations omitted).

 The *Estelle* standard for Eighth Amendment violations is a two prong test, requiring a showing: (1) that the prisoner's medical needs are serious; and (2) that the defendants showed deliberate indifference to those needs. *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir.1987); *Inmates of Allegheny County*

---

**25.** Section 1983 provides:
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
> 42 U.S.C. § 1983.

**26.** Section 1983 requires that the violation be committed by a state actor. In the present case, the moving defendants are "state actors" under 42 U.S.C. § 1983. *See West v. Atkins*, 487 U.S. 42, 54, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (holding a physician is considered a state actor when the physician is under contract to provide medical services to prisoners); *Ford v. Prison Health Servs., Scuibba*, C.A. No. 90–7253, 1991 WL 137022, at *1 (E.D.Pa. July 17, 1991) (holding that a physician is considered a state actor when the physician worked for Prison Health Services, a company under contract with the state to provide medical services to prisoners).

*Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir. 1979). The Court will consider each prong in turn.

The Third Circuit has described a "serious medical need" as "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Lanzaro,* 834 F.2d at 347 (quoting *Pace v. Fauver,* 479 F.Supp. 456, 458 (D.N.J.1979), *aff'd,* 649 F.2d 860 (3d Cir.1981)). In addition, a court may consider the effect on the plaintiff if the requested treatment is denied or delayed. *Washington v. Dugger,* 860 F.2d 1018, 1021 (11th Cir.1988) (condition need not be life threatening in order to be considered serious); *Lanzaro,* 834 F.2d at 347 (finding medical needs may be deemed serious if the denial or delay potentially would result in serious injury, long term harm or permanent disability). For the purposes of Defendants' motion for summary judgment, and construing the facts in the light most favorable to the non-moving party, the Plaintiff has sufficiently shown that hepatitis C and arthritis are serious medical needs. Both diseases can be chronic, debilitating and deforming. *See Thomas v. Dragovich,* No. 97–5814, 2000 WL 377770, at *1 (E.D.Pa. March 28, 2000) ("[Plaintiff's] right to medical treatment for Hepatitis was clearly established in 1997 [when the alleged violations occurred].").

However, in order to qualify for relief under § 1983, Plaintiff must satisfy the second prong of the *Estelle* standard and establish that each individual acted with deliberate indifference to his serious medical needs. Deliberate indifference may be displayed in a myriad of ways, such as where an official "(1) knows of prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; (3) prevents a pris-oner from receiving needed or recommended medical treatments." *Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir.1999) (citing *Durmer v. O'Carroll,* 991 F.2d 64, 68 (3d Cir.1993) (quoting *Lanzaro,* 834 F.2d at 346–47)).

However, the standard applied in reviewing the actions of prison doctors and medical staff in this type of case is deferential. *Inmates of Allegheny County Jail,* 612 F.2d at 762 (granting prison doctors significant latitude). Courts will generally refrain from "second guessing" the adequacy of a particular course of treatment when it is based on sound professional judgment. *See id.*

A misdiagnosis or preference for a certain type of treatment will not alone rise to the level of deliberate indifference. *See e.g., United States ex rel. Walker v. Fayette County, Pennsylvania,* 599 F.2d 573, 575 (3d Cir.1979); *Estelle,* 429 U.S. at 106, 97 S.Ct. 285 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."). Since there are many ways to treat an illness or ailment, courts generally do not hold prison doctors to the recommendations of other doctors. *See White v. Napoleon,* 897 F.2d 103, 109–10 (3d Cir. 1990). "[M]ere disagreement over acceptable treatment" does not amount to a violation. *Napoleon,* 897 F.2d at 110(citation and quotation marks omitted); *Clark,* 2000 WL 1522855, at *3 (finding no violation of Eighth Amendment where most of plaintiff's allegations revolved around differences of opinion as to what was the proper course of treatment).

Furthermore, a court will generally not find deliberate indifference when some level of medical care has been offered to the inmate. *Clark v. Doe,* No.

Civ. A. 99–5616, 2000 WL 1522855, at *2 (E.D.Pa. Oct. 13, 2000) ("Courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care.") (citing *Wilkins v. Owens*, Civ. A. No. 87–0954, 1987 WL 11940 (E.D.Pa. May 29, 1987)). In fact, courts may look to the quantity of services and types of treatments offered to the inmate in its evaluation. *Englerth v. Hetrick*, Civ. A. No. 87–5855, 1988 WL 11660, at *1 (E.D.Pa. Feb. 16, 1988) (finding plaintiff had received "substantial medical treatment while incarcerated" based on quantity of visits to prison medical facility and the fact plaintiff was referred to an outside specialist, even though plaintiff was not scheduled for a biopsy and did not receive the level of treatment desired for chronic liver disease.).

■ However, providing some type of treatment does not automatically preclude liability under the Eighth Amendment as the Third Circuit has found constitutional violations where some level of care had been provided, but the care was not based on sound medical judgment. Instances of such treatment include cases where the decision to pursue a course of treatment is based primarily on non-medical reasons, such as a prisoner's inability or unwillingness to pay, or where a medical official has denied the requested treatment with the intention of inflicting pain. *See e.g., Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999); *Napoleon*, 897 F.2d at 109 (citing examples such as leaving Debrox in the ear of one prisoner when there is no legitimate medical reason for doing so or denying Maalox and increasing risk of peptic ulcer based on inappropriate non-medical considerations). In *White v. Napoleon*, the Supreme Court found a violation where a prison physician did not base the course of treatment on sound medical judgment and "insisted on continuing courses of treatment that [he] knew were painful, ineffective or entailed substantial risk of serious harm to the prisoners." *Napoleon*, 897 F.2d at 109.

■ In the instant case, Plaintiff claims that Defendants violated his rights under the Constitution by misdiagnosing him with RA, ignoring or avoiding the opinions of other doctors who found that he suffered from hepatitis C-related arthritis, refusing to treat his hepatitis C with interferon/ ribavirin, and by briefly denying him his arthritis medication. After drawing all reasonable inferences in favor of the Plaintiff, this Court concludes that the evidence in the summary judgment record fails, as a matter of law, to demonstrate the type of deliberate indifference necessary to establish a violation of the Eighth Amendment.

Plaintiff claims that he was initially misdiagnosed with RA, and that he should have been diagnosed with hepatitis C-related arthritis. While Plaintiff's medical history shows that he has tested positive for hepatitis C, it is not clear from the record that his hepatitis C is in fact the source of Plaintiff's arthritis. Two outside specialists, Dr. Tika and Dr. Gordon, suggested that Plaintiff's hepatitis C was a cause of his arthritis. However, even Dr. Gordon noted that Plaintiff's symptoms could stem from *either* RA *or* his hepatitis C and Dr. Tika found that Plaintiff suffered from *both* RA and hepatitis Crelated arthritis. In addition, the court-ordered experts, Dr. Falasca and Dr. John, both concluded that Plaintiff was properly diagnosed with RA and that his hepatitis C is not the source of his arthritis. (Exh.'s H & I.) The diagnosis of RA was based on Plaintiff's liver function tests and the reports of Dr. Parks, Dr. Starrett, Dr. Ryan and Dr. Kulkarni. Thus, while it is undisputed that Plaintiff has hepatitis C, it is not clear from the record that Defendants misdiagnosed Plaintiff's arthritis and it is likely that Plaintiff does not suffer from hepatitis C-related arthritis.

Even were this Court to find that Plaintiff was misdiagnosed, Plaintiff still has not shown the requisite level of deliberate indifference to establish a constitutional violation. As a matter of law, a misdiagnosis alone will not constitute deliberate indifference. *See United States ex rel. Walker,* 599 F.2d at 575. At the time of his initial diagnosis, Plaintiff exhibited signs of RA and tested with a positive RH factor. Defendants based the diagnosis of RA on Plaintiff's test results and the reports of several physicians, all of whom came to the same conclusion. As Dr. Falasca noted in his report, because the standards for diagnosing and treating hepatitis C are in a state of flux as new and evolving products and research enter the medical field, it is not unusual for hepatitis C and related illnesses to be confused or overlooked. Dr. Falasca also noted that Plaintiff exhibited all the clinical signs of RA, and further pointed to other medical evidence which would support a conclusion that Plaintiff suffered from RA and not hepatitis C related arthritis. Therefore, even were this Court to find that Plaintiff was initially misdiagnosed with RA, and that he does indeed suffer from hepatitis C-related arthritis, Defendants' conduct would not amount to deliberate indifference.

Moreover, the Defendants' decision not to alter Plaintiff's course of treatment based on Dr. Tika's and Dr. Gordon's suggestion that Plaintiff may suffer from hepatitis C-related arthritis did not violate Plaintiff's constitutional rights. Plaintiff contends that Defendants ignored Dr. Tika's and Dr. Gordon's opinions. However, this Court finds that Dr. Robinson was not deliberately indifferent for not concurring with the diagnosis of hepatitis C-relat-

ed arthritis and that the decisions regarding Plaintiff's treatment were based on sound professional judgment. As a general matter, physicians do not exhibit deliberate indifference merely because they choose not to follow the advice of another doctor. *See e.g., Napoleon,* 897 F.2d at 109–10. Dr. Tika was the first doctor to suggest that Plaintiff's hepatitis C was the cause of his arthritis symptoms. However, Dr. Tika also noted the presence of RA or other types of arthritis. Dr. Gordon also noted the possibility of hepatitis C related arthritis, but suggested another type of arthritis might also be present. Dr. Robinson's diagnosis and formulation of a course of treatment was based on Plaintiff's entire medical history, including the reports of at least four physicians, all of whom had concluded Plaintiff suffered from RA. Furthermore, neither Dr. Gordon's nor Dr. Tika's reports recommended any significant changes in treatment. In fact, after Plaintiff met with Dr. Tika, Dr. Robinson continued treatment, as per Dr. Tika's recommendations, with an increased dosage of Celebrex. Even were it established that Dr. Tika was correct in his diagnosis of hepatitis C-arthritis and that Dr. Robinson misdiagnosed Plaintiff and then decided not to modify the initial diagnosis to include a diagnosis of hepatitis C-related arthritis, the evidence in the record would still be insufficient to establish a constitutional violation.

Plaintiff further contends that the denial of his request for treatment of his hepatitis C with interferon/ ribavirin combination therapy is evidence of deliberate indifference.[27] The record, however, does not contain compelling evidence that interferon/ ribavirin is the appropriate treatment for Plaintiff at this time. The regulations

---

27. While the presence of hepatitis C plays a role in Plaintiff's claims regarding his arthritis, he also states a separate claim that his hepatitis C, in general, is not being properly treated. The request for interferon/ ribavirin goes to Plaintiff's hepatitis C, and not his arthritis claims.

set forth by the Bureau of Prisons discuss when interferon/ ribavirin treatment would be appropriate. (Exh. F.) Defendants have concluded based on those criteria that Plaintiff is not a candidate because he has tested with normal liver functions and has admitted to being previously diagnosed with a psychiatric illness and/ or depression. In order to qualify under the regulations, Plaintiff's tests results would need to show an elevated level of liver enzymes and abnormal liver functions. In addition, the regulations suggest that prisoners with histories of depression and/ or psychiatric illness should not take interferon/ ribavirin, because such treatment could cause severe psychiatric problems.[28] Plaintiff's present course of treatment, in which his liver functions and liver enzymes are monitored regularly, is consistent with the standards set forth by the Bureau of Prisons. The medical evidence does not demonstrate that Plaintiff's hepatitis C has reached the point where an intensive program of drug therapy, such as interferon/ ribavirin, would be preferred over Plaintiff's present course of treatment. Indeed, Dr. John noted in his report that starting Plaintiff on a drug therapy program might even aggravate Plaintiff's symptoms and damage his liver.

Even were this Court to find that interferon/ ribavirin treatment is appropriate in Plaintiff's case, Plaintiff has still not met his burden of showing the denial of such treatment constitutes a violation of the Eighth Amendment. Plaintiff suggests that non-medical reasons, such as financial concerns, are motivating Defendants. However, Defendants provided ample medical evidence, such as the opinions of Dr. Falasca and Dr. John, and other evidence, such as the Bureau of Prisons regulations, to show that the course of treatment provided is based on sound medical judgment. In addition, there is no evidence indicating that the denial of Plaintiff's request for interferon/ ribavirin therapy was motivated by inappropriate non-medical reasons. The Constitution does not guarantee that every prisoner will receive every type of treatment he desires, or even may need. While the standard protocol for treating hepatitis C may be evolving, nothing in the record suggests that interferon/ ribavirin is necessary for proper treatment and there is no evidence that the course of treatment adopted by Defendants deviates from the standard medical practice. Prison health officials are given great latitude in forming treatment plans and differences in opinions between prisoners and doctors, as a matter of law, do not amount to a constitutional violation.[29]

Finally, Plaintiff contends that the temporary suspension of his arthritis medication constituted deliberate indifference, as it caused him to suffer considerable mental and physical pain.[30] However, De-

---

**28.** *See supra* note 13 and accompanying discussion.

**29.** Plaintiff has also requested that this Court order Defendants to provide Plaintiff with a liver biopsy in order to determine whether or not Plaintiff's liver is damaged from his hepatitis C, and if so, to also determine what treatment, if any, would be appropriate. Because this Court has found that Defendants have provided Plaintiff with adequate medical treatment and because the medical evidence in the record shows that treatment of Plaintiff's hepatitis C beyond the present course of

monitoring Plaintiff's liver functions is unnecessary, this Court will defer to Defendants' judgement that a liver biopsy is not appropriate at this time. Therefore, Plaintiff's motion to compel a liver biopsy will be denied.

**30.** As a general matter, this Court is concerned with claims alleging an inappropriate denial of pain medication, especially when the denial forces a prisoner to endure significant mental and physical pain. However, in the instant case, Defendants' actions do not rise to a constitutional violation. *See generally, Clark*, No. Civ. A. 99–5616, 2000 WL

fendants provide justifiable reasons as to why medication was temporarily suspended. NP Fran Green put the order on hold after Plaintiff informed her that he had seen Dr. Gordon and that Dr. Gordon advised him that he did not have RA. In her judgment, it was important to ensure that if Dr. Gordon had provided a different diagnosis for Plaintiff, that Celebrex was compatible with the different diagnosis. There is no evidence in the record which would tend to cast doubt on NP Fran Green's explanation or suggest that the decision to temporarily discontinue Celebrex was motivated by an intention to inflict pain. Indeed, the evidence in the record indicates that soon after receiving Dr. Gordon's report, NP Fran Green reordered Plaintiff's Celebrex. Accordingly, this Court concludes that the evidence is insufficient to establish that the Defendants acted with deliberate indifference in temporarily discontinuing Plaintiff's Celebrex prescription.

Indeed, the record shows a consistent effort to provide the Plaintiff with medication and treatment to ease the pain and discomfort associated with his arthritis. Plaintiff did receive adequate medical care in the form of visits to the doctor on site, consultation requests, referrals to specialists, prescriptions for pain relievers and other medications, x-rays and monitoring of liver enzymes.

## V.

This Court recognizes the seriousness of hepatitis C and the medical problems it causes for many prisoners housed in New Jersey. It is especially important for the prison health system to provide treatment and education regarding diseases, like hep-

atitis C, which are contagious and can, if not properly monitored and treated, cause serious, potentially life threatening complications. However, the allegations that Plaintiff makes in the instant case do not amount to the deliberate indifference which the Eighth Amendment is intended to proscribe.

Because the Court concludes that the evidence in the summary judgment record fails as a matter of law to establish the type of deliberate indifference necessary to show a constitutional violation, the Defendants' motion for summary judgment will be granted.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION TO COMPEL A LIVER BIOPSY

This matter having appeared before this Court upon Defendants' Motion for Summary Judgement and Plaintiff's Motion to Compel a Liver Biopsy, the Court having considered the submissions of parties, for the reasons set fourth in an opinion issued by this Court, which findings of fact and conclusions of law are incorporated herein by reference, and for good cause appearing,

**IT IS** on this *20th* day of August, 2002,

**ORDERED THAT:**

1. Defendants' Motion for Summary Judgment is **GRANTED**; and

2. Plaintiff's Motion to Compel a Liver Biopsy is **DENIED.**

---

1522855, at \*4 n. 4 (The court "recognize[d] the serious nature of plaintiff's condition and [did] not condone a number of the actions attributed to defendants .... [and was] concerned over [plaintiff's] allegations that at times his pain medication was inadequate .... however, [plaintiff's] allegations at best suggest nothing more than negligence on the part of defendants.").